## BEACH v. BUSEY.
### No. 10210.
Circuit Court of Appeals, Sixth Circuit.

July 15, 1946.

Mark A. Loofbourrow, of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief; Warner M. Pomerene, of Coshocton, Ohio, and Mark A. Loofbourrow, of Cleveland, Ohio, of counsel), for appellant.

P. R. Mickey, of Washington, D. C. (Sewall Key, Helen R. Carloss, and James P. Garland, all of Washington, D. C., and Ray J. O'Donnell, of Columbus, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

Upon the consideration of many cases involving inclusion of property in the gross estate of a decedent under § 302(c) of the Revenue Act of 1926 as amended, Internal Revenue Code § 811(c), 26 U.S.C.A. Int.Rev.Code, § 811(c), there emerges an interpretation (after some mutations, as in Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239, and Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35), that § 302(c) reaches all inter vivos transfers which may be resorted to as a substitute for a will in making dispositions of property operative at death (Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368); that it sweeps into the gross estate all property, the ultimate possession or enjoyment of which is held in suspense until the moment of the decedent's death, or thereafter (Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 783, 159 A.L.R. 227); and that the essential element is the decedent's possession of a reversionary interest at the time of his death, notwithstanding such reversionary interest might disappear prior to death. Goldstone v. United States, 325 U.S. 687, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330.

The problem posed for us in the present appeal is whether by the terms of two trust instruments executed by appellant's decedent, Harry L. Beach, all possibility of reversion of interest therein upon any contingency was successfully excluded. In 1925 and 1926 Beach and his wife Elizabeth, created trusts to each of which Beach contributed $80,000 and his wife, Elizabeth, $20,000 in Liberty bonds. The trust indentures, so far as here material, were identical, and provided that the income should be paid to the wife Elizabeth during the life of Beach, and upon his death to be divided between Elizabeth and a daughter Camilla, or go to the survivor for life. Each trust was to terminate on the death of the survivor of Mrs. Beach and Camilla. At the time the first trust was created the settlors had three children and two grandchildren; at the time the second was created they had three living children and three living grandchildren. Beach died March 25, 1942, survived by his widow, Elizabeth, his son, two daughters and four grandchildren. Camilla was 42 years old, an invalid, unmarried and unable to support or care for herself. At the time of his death, Beach had an individual estate of over $450,000, exclusive of the corpora of the trusts and gifts which he had made to his wife, son and a daughter Nelle. He had never made any gift to his daughter Camilla, except the life interest given to her by the trust instruments.

The specific issue on this appeal involves a construction of paragraph D(2) of each trust, which in full is as follows:

"This trust shall terminate upon the death of the last survivor of the Settlor, Elizabeth C. Beach and the daughter of said Settlors, Camilla Beach, and upon the termination of this Trust said trust fund, together with any accumulations thereto, shall be distributed according to the Statutes of descent and distribution of the · State of Ohio, to the heirs at law of Harry L. Beach and Elizabeth C. Beach, providing the heirs of both Harry L. Beach and Elizabeth C. Beach are the same persons.

"Should the said Harry L. Beach and Elizabeth C. Beach leave no lineal descendants of their direct line, and the next of kin of each were collateral heirs, then said trust fund shall upon the termination of this trust be distributed eighty (80%) per cent to said collateral heirs at law of Harry L. Beach, and twenty (20%) per cent to the said collateral heirs at law of Elizabeth C. Beach."

It will be observed that the trusts terminate on the death of the survivor of Elizabeth and Camilla, and the question; according to the appellant, is who would receive the principal of the trusts at that time. The district court found that the decedent intended by the above language to provide that if he survived his wife and daughter his contribution to the trust would revert to him free of the trusts. The appellant maintains that this construction is in complete disregard of the express intention of the settlors to relinquish all interest in the trust property, and relies not only upon the provisions of paragraph D(2) but on paragraph D(12) of each trust, which provides: "It is expressly understood and agreed that this Trust is not revocable by any action of the Settlors hereunder, all of the Settlors' rights as to said property having terminated upon the execution of this agreement, except as provided herein."

The exception does not become important because it relates to a limited right of Beach, never used, to be consulted during his lifetime as to investments.

█ It will be noted that at the termination of the trusts the trust funds are to be distributed according to the statutes of descent and distribution of the State of Ohio, Gen. Code, § 10503-1 et seq., "to the heirs at law of Harry L. Beach and Elizabeth C. Beach," provided they are the same persons. At the common law, an inter vivos conveyance to a person for life, remainder to the heirs of the conveyor, created no estate in the heirs. Coke upon Littleton, § 22b. The origin and justification for the rule is to be found in § 314, Restatement of Property. A living person has no heirs. Earlier considered as a rule of law in England, the doctrine was abrogated as such by the Inheritance Act of 1833, though some American cases still treat it as a strict rule of law. Miller v. Fleming, 7 Mackey 139; Harris v. McLaran, 30 Miss. 533; Burton v. Boren, 308 Ill. 440, 139 N.E. 868; Morsman v. Commissioner, 8 Cir., 90 F.2d 18, 113 A.L.R. 441; West Tennessee Co. v. Townes, D. C.Miss., 52 F.2d 764.

█ Well-considered opinions and textwriters, however, prefer to treat the doctrine as a rule of construction rather than as a strict rule of law. Simes, Law of Future Interests, § 147; Doctor v. Hughes, 225 N.Y. 305, 122 N.E. 221; Whittemore v. Equitable Trust Co., 250 N.Y. 298, 165 N.E. 454; Law Institute, Restatement of Property, § 314. As rationalized by Chief Judge Cardozo in Doctor v. Hughes, supra, the rule persists today but as a rule of construction, and to transform into a remainder what, under the common law, would have been a reversion, the intention to work such transfer must be clearly expressed. If there is nothing in the instrument to suggest a purpose to vary the course of descent and distribution as it would be regulated by law, there is a reversion in the grantor and the grantees have an expectancy and not an estate.

How the courts of Ohio would treat this ancient rule is not clear. There is a bald statement of the common-law doctrine in Kuhn v. Jackman, 32 Ohio App. 164, 166 N.E. 247, but the case was decided upon other grounds. Other Ohio cases have indicated that the word "heirs" is a flexible one to be construed so as to give effect to the manifest intent of the testator or settlor.

Jones v. Lloyd, 33 Ohio St. 572; Collier v. Collier's Executors, 3 Ohio St. 369; McKelvey v. McKelvey, 43 Ohio St. 213, 1 N. E. 594. The collection of modern cases on the subject to be found in Wilcoxen v. Owen, 237 Ala. 169, 185 So. 897, 125 A.L.R. 548, seems to make it clear that whether as a rule of law or construction, it extends in most jurisdictions to include personal as well as real property.

We accept the view that regardless of the term "heirs" we must seek the intention of the settlors in the ultimate disposition of the trust corpora, or as the appellant puts it, "determine what Mr. and Mrs. Beach intended by the language of the instruments, and not by what Mr. Blackstone might have intended by it." The term "heirs" and the phrase "lineal descendants," he urges, are used interchangeably, and lineal descendants is a more accurate description of the people whom the settlors meant primarily to benefit in the distribution of the trust remainders.

Giving liberal consideration to this rationalization we are still confronted by difficulties. The trusts terminate with the death of the survivor of Mrs. Beach and her daughter Camilla, and the trust funds are then to be distributed to the common lineal descendants of Harry Beach and Elizabeth Beach, according to the statutes of descent and distribution of the State of Ohio. But should Beach survive the life tenants and therefore the termination of the trusts, there can be no distribution of the trust funds according to the statutes of descent and distribution because they speak only as of the date of his death, and the lineal descendants then living, or their issue, would take their distributive shares not by purchase but by the law of descent and distribution, for it is only at his death that the members of the class are determinable. This will be perceived in the event of the death of common lineal descendants leaving issue prior to the death of Beach. It would seem, therefore, that an expectancy in the trust funds might ripen into title only upon the death of Beach, and so in the words of Klein v. United States, 283 U.S. 231, 51 S.Ct. 398, 399, 75 L.Ed. 996, the death of the grantor would become "the indispensable and intended event which brought the larger estate into being for the grantee and effected its transmission from the dead to the living, thus satisfying the terms of the taxing act and justifying the tax imposed."

But another contingency perhaps even more clearly indicates that the settlors did not exclude the possibility of a reversion. It is clear from the terms of paragraph D(2) of the trust indentures, that the settlors considered the possibility of lineal descendants who were not the lineal descendants of both. These might come into being in one or more of several circumstances. Should the settlors be divorced during the life of the trusts, remarry and have children, or should Harry Beach remarry after the death of Elizabeth and before the trusts are terminated by the death of Camilla, and have children, these would be lineal descendants though not the lineal descendants of both, and not being common lineal descendants of the settlors could take no remainders under the first part of paragraph D(2). But they would be next of kin interposed between the settlors and their collateral heirs, cutting off any estate that would pass to such collateral heirs under the second part of the paragraph, since under that provision collateral heirs may take only if they are next of kin. Therefore, in the event of the death of all of the common lineal descendants of the settlors, prior to the death of Beach, and the existence of lineal descendants who, as next of kin, would prevent the passing of remainders to collateral heirs in the ratio provided, the trusts would fail and a reversion of the trust corpora to Beach would follow. Since the possibility of such reversion, however remote, was not terminated until the death of Beach, it was his death that caused the vesting finally of an estate in the common lineal descendants of the settlors, and so under the interpretation of § 302(c), developed in the cases heretofore cited, the corpora of the trusts contributed by Beach remained in his gross estate. Wherefore, the judgment below is affirmed.